CLERK'S OFFICE
A TRUE COPY
Sep 25, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

United States of America
v.
Savanah Jug (XX/XX/1999), Jennifer Shields (XX/XX/1980), Julie Gardner (XX/XX/1962), and David Juarez (XX/XX/1980)

*Defendant(s)*

Case No. 26-MJ-523 (SCD)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 2022 - present in the county of Milwaukee in the Eastern District of Wisconsin, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title18, United States Code, Sections 371,1343, 1344, 1956, and 1957 | Conspiracy, Wire Fraud, Bank Fraud, Money Laundering and Money Laundering Conspiracy, and Unlawful Monetary Transactions |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Jeremy Grobart, IRS-CI Special Agent
*Printed name and title*

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. 4.1

Date: 9-25-26

[signature]
*Judge's signature*

City and state: Milwaukee, Wisconsin

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR CRIMINAL COMPLAINT**

I, Jeremy J. Grobart, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service (IRS-CI), United States Department of the Treasury, and have been since July of 2021. Prior to that, I was employed as a Police Officer with the City of Madison, Wisconsin. I received a Masters in Business Administration, with a concentration in Data Analytics, from Loyola University Chicago. I have conducted numerous investigations involving violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and other related offenses. I have been the affiant on numerous warrants, including having participated in the execution of numerous warrants. I have completed the Criminal Investigator Training Program and the Special Agent Investigative Techniques Program at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received extensive training on financial investigative techniques.

2. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter. All of the information contained herein is based upon my knowledge of this investigation or upon information supplied to me by other law enforcement officers or citizen witnesses, all of whom I believe to be truthful and reliable.

3. Based on the facts set forth in this affidavit, there is probable cause to believe that SAVANAH JUG (DOB: 9/6/1999), JENNIFER SHIELDS (DOB: 2/4/1980), JULIE GARDNER (DOB: 12/26/1962), and DAVID JUAREZ (DOB: 3/4/1980) have committed, or aided and abetted, violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud),

1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions).

## PROBABLE CAUSE

### *Investigation Background*

4. In the spring of 2026, the Internal Revenue Service–Criminal Investigation and Waukesha Police Department began investigating JUG, SHIELDS, GARDNER, and JUAREZ after having received reports that they were financially exploiting elderly individuals in the Eastern District of Wisconsin. Investigators determined that JUG and SHIELDS persuaded victims to give them substantial sums of money under false pretenses, including by claiming that they needed the funds to pay alleged Internal Revenue Service (IRS) tax debts or to invest in a purported (but fictitious) business. Bank records reviewed to date show that approximately $3,500,000 in fraudulent proceeds were transferred from victims' bank accounts into accounts controlled by JUG, SHIELDS, GARDNER (who is SHIELDS's mother), and JUAREZ (who is SHIELDS's romantic partner).[1]

### *Victim A*

5. Victim A's wife died from COVID-related complications in 2022. Following her death, and due to Victim A's declining health, his former pastor, G.L., became his financial power of attorney. In the summer of 2025, Victim A met and befriended JUG, who shortly thereafter told Victim A that she owed the IRS $63,000 in unpaid taxes. Victim A told investigators that he agreed to give JUG $63,000 to pay her supposed tax debt, and he accompanied JUG to a BMO Bank location to obtain a cashier's check for that amount. Victim A said BMO employees warned him that if the funds were genuinely intended for tax debt, the cashier's check should be made payable

[1] The banks and credit unions referenced in this affidavit were, at all relevant times, federally insured.

to the Internal Revenue Service rather than to JUG. Despite the bank employees' attempts to dissuade Victim A, he obtained a cashier's check payable to JUG. Investigators later located the check deposited in JUG's bank account and confirmed that none of the funds were used for IRS-related expenses.

6. Investigators have confirmed that neither JUG nor SHIELDS (as explained further below) have or had outstanding tax debt owed to the IRS during any point relevant to the timeframe of the scheme described herein, including in 2025 or 2026. As to state tax debt, an agent with the Wisconsin Department of Revenue told investigators that JUG owes a small amount of tax debt ($159) but that no active collection efforts have been made to collect on that debt. The agent said that SHIELDS owed approximately $59,000 in back taxes in or around 2016, and that the state sent letters to SHIELDS through April 2023 seeking to collect that debt, but there have been no active collection efforts since then. The agent confirmed neither JUG nor SHIELDS paid the Wisconsin Department of Revenue the back taxes they owed.

7. A few months later, in December 2025, JUG presented Victim A with a promissory note purportedly memorializing her promise to repay him. The note listed two different repayment amounts—$150,000 and $160,000. JUG attached to the note a purported "Settlement and Release Agreement" between her and "Aurora Hospital," which purported to show that "Aurora Hospital" agreed to pay JUG $192,076.30 to settle a lawsuit that JUG had filed. That settlement agreement displayed several indicators that it was fraudulent, including that "Aurora Hospital" is not a real entity, the document did not list a court where the purported lawsuit was filed, the case number of the purported lawsuit ("2025-NX-01") is not consistent with case numbering from any court in Wisconsin, and the names of her purported lawyers do not correspond to actual attorneys in Wisconsin. Victim A told investigators that JUG claimed she would repay Victim A with the

money she was owed from the purported Aurora Hospital settlement. Victim A accepted the promissory note as an assurance that JUG would repay him.

8. In March 2026, JUG introduced Victim A to SHIELDS, whom she falsely described as her aunt. In fact, SHIELDS is the mother of JUG's children's father. JUG and SHIELDS told Victim A that they intended to purchase an Amazon subcontracting delivery business supposedly owned by JUAREZ, and they asked Victim A for his financial assistance to purchase the business. JUAREZ is actually SHIELDS's romantic partner, with whom she lives, and he does not (and did not in early 2026) own a transportation business. JUG and SHIELDS told Victim A that JUAREZ's business was called "JJJ" or "3J's"; no such business has been incorporated in Wisconsin.

9. Victim A agreed to assist in purchasing the non-existent transportation business. He gave JUG and SHIELDS a signed blank check with the intention that they could use it to purchase a sprinter delivery van for business operations. SHIELDS later sent Victim A, via text message, an image of a partial license plate, claiming it belonged to the delivery van that she and JUG purchased with Victim A's funds. However, law enforcement records show the license plate was registered to a Chevy Silverado pickup truck with VIN 1GCUYEET5MZ192060 that had been recently purchased by JUAREZ. Investigators later determined that Victim A's check had been written out to JUAREZ; specifically, Landmark Credit Union records show check #153, drawn from Victim 1's account x2421, was issued to JUAREZ for $46,000. The memo line on the check reads "van purchase." Although the check bears Victim 1's signature, the remaining handwriting on the check does not match Victim 1's handwriting. JUAREZ used part of the funds to purchase the Chevrolet Silverado for his own personal use, not a delivery van for any legitimate business. The Chevrolet Silverado is registered to the shared residence of SHIELDS and JUAREZ at 1442 Big Bend Road, Unit D, Waukesha, WI 53189.

10. Victim A was unaware of this and continued providing money to JUG and SHIELDS to purchase the "business" from JUAREZ. JUG and SHIELDS told Victim A that the purchase price for the supposed transportation business was $220,000. Victim A agreed to provide them with that amount, for that purpose.

11. On April 4, 2026, Victim A deposited $220,000 into a joint UW Credit Union account (x8201) he shared with JUG. Two days later, JUG transferred $210,000 into her personal UWCU account (x8701) and then wired $110,000 to JUAREZ's personal Wells Fargo checking account (x4270). After the transfer, UWCU requested Wells Fargo return the funds due to suspected fraud. On May 21, 2026, UWCU received $108,500 back from Wells Fargo and issued it via cashier's check to Victim A, who then immediately deposited it into a new US Bank account. On June 2, 2026, Victim A withdrew $109,000 from that US Bank account, in the form of two cashier's checks—one payable to DAVID JUAREZ for $55,000 (memo: land rent) and the other payable to SAVANNAH JUG for $54,000 (memo: property). That same day, SHIELDS texted Victim A: "Cashier's check one is made out to JUG in the amount of $54,000 for land rent. Cashier's check number two is made out to JUAREZ in the amount of $55,000 for farming equipment." Victim A told investigators the purpose of the false memo lines was to deceive the bank about the checks' true purpose, so that bank was less likely to flag or freeze them.

12. In July 2026, Victim A confronted SHIELDS about having provided approximately $800,000 to JUG and SHIELDS without receiving any repayment. SHIELDS told Victim A that she was unable to pay him back because her accounts supposedly had liens on them, preventing her from accessing funds in the accounts, due to IRS tax warrants totaling $365,000. SHIELDS also told Victim A that she needed additional money to pay off this purported IRS debt so that she

could sell a bar she claimed to own for $850,000, and then use the proceeds to repay Victim A. Investigators did not locate any evidence suggesting SHIELDS actually owns or owned a bar.

13. SHIELDS then provided Victim A with two purported insurance-claim checks, made out to her and JUG, from Farmers Insurance as "collateral" for the debt she owed to him. These checks appeared legitimate to Victim A and were intended to convince him that SHIELDS and JUG had the ability to repay him once their accounts were "unfrozen." The checks indicated they were drawn on Summit Credit Union. Both Summit Credit Union and Farmers Insurance confirmed to investigators that the checks were not legitimate.

14. On the morning of July 21, 2026, SHIELDS went to Victim A's residence and attempted to have Victim A apply for a $350,000 home equity line of credit (HELOC) loan through US Bank so she could use the funds to pay off her supposed tax debt. SHIELDS assisted Victim A in creating an online account, and calling a banker regarding the loan, telling Victim A that the process would be "very easy." Investigators later reviewed text messages between JUG, SHIELDS, and Victim A, which showed that SHIELDS had texted Victim A the username and password information for the HELOC application.

15. Bank records reviewed by investigators thus far show approximately $470,000 provided by Victim A to JUG, JUAREZ, GARDNER, and SHIELDS between August 7, 2025, and May 6, 2026.

***Victim A Text Messages***

16. Victim A consented to investigators downloading the contents of his cell phone and reviewing its contents, including communications between him, JUG, and SHIELDS. These text messages show that SHIELDS repeatedly pressured Victim A into transmitting large sums of

money, based on fabricated IRS emergencies, fictitious business opportunities, and false promises of repayment.

17. For example, on March 12, 2026, SHIELDS wrote, "I just wanted to text you back and say I'm literally begging you to please do this for her [JUG]. You can trust me to pay every dime back and we can open you a new IRA. I only need 2 to 3 weeks to pay you back. I will pay all penalties and taxes. I will not let you down. I am a good honest person. I've never borrowed money from anybody. I'm only doing this for [JUG] and the kids. Please help me. I don't have anybody else and I promise I will help find a new IRA to put all the money back in when I pay you back." She continued reinforcing nonexistent IRS crises, telling Victim A on April 23, 2026, "I can't think clear with all this shit going on with [JUG] and the IRS and the bank."

18. On June 25, 2026, SHIELDS texted Victim A, in an effort to convince him that she had assets with which she could repay him, "I have millions of dollars and assets and I can't even get my hands on $1,000 right now."

19. Possibly having learned that investigators had interviewed Victim A, SHIELDS texted him the morning of his planned meeting at the Waukesha Police Department (July 21, 2026), continuing her fabricated tax-warrant narrative, stating, "You know the money that you were gonna borrow to me was for the tax warrant, for my tax warrant that I have online, so we could start the business."[2]

20. Victim A's text messages to SHIELDS show his reliance on the misrepresentations made to him by JUG and SHIELDS. For example, on March 9, 2026, he texted, "Hey Jen, where are

---

[2] Wisconsin Consolidated Court Automation Program (CCAP) records show that SHIELDS has three outstanding state tax warrants in Waukesha County, under case numbers 2018TW000252, 2019TW000287, and 2020TW000299, totaling $30,322.31 owed to the Wisconsin Department of Revenue. However, as described above, a special agent with the Wisconsin Department of Revenue informed investigators that, despite these warrants, there were and are no liens, levies, or active collection efforts on any bank accounts belonging to SHIELDS, JUG, GARDNER, or JUAREZ, contrary to the representations made to victims.

you, I am waiting to hear from you. I would like to help [JUG] and see the van and the business. I have time today. Please get back to me soon, so we can get something done." A few days later, on March 16, 2026, Victim A again texted SHIELDS, stating, "How is the bail money coming. I talked to another agent and maybe I could help with some money. Everybody forgets I help her with 225,000 and a whole lot more. I only have so much money to work with. I am not a rich man but I am a man with a heart."

***Victim B***

21. Victim B met JUG at Heartbreakers Strip Club in November 2022, where JUG works. Approximately one month later, JUG introduced Victim B to SHIELDS. Victim B recalled having previously visited SHIELDS's residence at 1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189. Soon after meeting JUG and SHIELDS, both JUG and SHIELDS began soliciting money from Victim B under false pretenses.

22. For example, SHIELDS told Victim B she owed $70,000 in back taxes. Believing she would repay him, Victim B told investigators that he took a loan from his 401(k) and provided a check to JUG for SHIELDS's supposed tax debt.

23. Shortly after this, SHIELDS told Victim B that she owed an additional $60,000. She claimed this was due to her ex-husband having placed business equipment in her name, making her liable for the taxes. Because Victim B could not take more than one loan from his retirement account at a time, SHIELDS helped Victim B fabricate an exigency that would allow him to take out more money. Specifically, SHIELDS created, or had someone else create, two false repair estimates for storm damage that supposedly occurred to Victim B's home. Victim B then provided those estimates to Victim B's retirement plan, by mail, to justify withdrawal under purported

exigent circumstances. No actual storm damage had occurred, but the fabricated reports resulted in Victim B taking additional withdrawals for SHIELDS to pay her fictitious IRS debt.

24. Records from Victim B's T-Rowe Price Retirement account show withdrawals consistent with what Victim B told investigators, including a 02/17/2023 withdrawal of $27,760.42 (before taxes), a 03/22/2023 withdrawal of $79,000.00, and a 04/10/2023 withdrawal of $46,500.00. Approximately one week after that last withdrawal, of $46,500, was deposited into Victim B's account, a cashier's check was issued from that account to JUG for $43,000.

25. Around March 2023, Victim B also obtained an $80,000 HELOC loan at JUG's and SHIELDS's insistence, believing the proceeds were needed to satisfy SHIELDS's additional tax liabilities.

26. Investigators showed Victim B an image of a $77,000 cashier's check he drew from his BMO Bank account on March 25, 2024, made payable to Austin Shields, SHIELDS's son (and the father of JUG's children). Victim B stated that SHIELDS directed him to write the check to Austin Shields so it would avoid bank scrutiny, particularly because BMO had already warned him he was being scammed.

27. In mid-2024, JUG told Victim B that SHIELDS was incarcerated for unpaid taxes. Victim B reported that there were periods when SHIELDS was supposedly released and communicated with him, only to later be "picked up" again by law enforcement for continued tax delinquency. Victim B was told that SHIELDS and JUG were being held in jails located in Waukesha County, Dane County, and another unidentified county in northern Wisconsin. During these periods of alleged incarceration, Victim B was told that GARDNER and JUG remained in communication with SHIELDS.

28. Victim B recalled an incident in which he traveled to Waukesha Memorial Hospital, where he met SHIELDS's daughter, "Angel," in the parking lot. During this encounter, Victim B provided Angel with money that he believed was intended to be used as bail funds for both JUG and SHIELDS, who he had been told were incarcerated for unpaid IRS tax balances. To reinforce this claim, SHIELDS sent Victim B photographs of receipts purporting to be from the IRS and jail facilities (but which were false), attempting to convince him that the funds were being used for bail associated with tax-related offenses.

29. SHIELDS and JUG continued soliciting money from Victim B through 2026. Victim B estimates that he has provided more than $1,000,000 to JUG and SHIELDS, some of which was paid directly to JUAREZ. As a result of the fraud, Victim B depleted his retirement account, lost his home and motorcycle, and ultimately filed for bankruptcy. Victim B told investigators that he who now donates plasma "just to survive." He told investigators he has received no repayment from SHIELDS, JUG, JUAREZ, or GARDNER.

30. Bank records reviewed by investigators thus far have identified approximately $420,000 provided by Victim B to JUG, JUAREZ, GARDNER, and SHIELDS between August 25, 2023, and July 19, 2024.

***Victim B Text Messages***

31. On August 4, 2026, Victim B consented to investigators downloading the contents of his cell phone and reviewing its contents, including communications between him, SHIELDS, and JUG. As with Victim A, these text messages show SHIELDS and JUG using electronic communications to solicit large sums of money from Victim B by fabricating IRS emergencies, falsely claiming frozen bank accounts, and pressuring him to take out additional loans.

32. For example, on March 7, 2023, SHIELDS sent Victim B a photo of a purported $269,254 US Bank check, allegedly from the sale of a condo she owned, boasting, "now I only have two condos left. I'm a little sad." A few days later, on March 14, 2023, SHIELDS texted Victim B about this same check, stating, "My checks are still not cleared. I just checked the bank. My available balance is $123.33 and my ledger balance says $704,378.24. It looks so nice on there. I think that's the most I've ever had lol." Investigators believe SHIELDS sent Victim B a false check image (similar to images she sent to Victim A and later Victim D) to make him believe she had funds to repay him.

33. On March 16, 2023, SHIELDS told Victim B, "I have a bunch of bills I have to pay. The IRS is sending me threatening letters because I borrowed Savannah all that money in the beginning of the year. They're threatening me for my business taxes. I owe them $77,000. I need to take care of that on Friday so I just have a lot of stuff to do." A week later, on March 24, 2023, SHIELDS insisted on receiving the entire $77,000, telling Victim B, "If you could do the whole $77,000 that would be great. I did call and if I give them a cashier's check it'll take 10 days to clear before they can post it to my account. If we pay them in cash it'll be released immediately. I can't pay any debit cards or personal checks because my account is froze."

34. On March 28, 2023, Victim B asked SHIELDS for a receipt confirming that the $77,000 was used to pay the IRS. SHIELDS then sent Victim B a fictitious IRS form titled "668-D Release of Levy/Release of Property Levy" to make him believe the payment had been made. The $77,000 referenced in these communications was the same cashier's check that Victim B wrote to "Austin Shields," about which investigators later questioned Victim B.

35. Like SHIELDS, JUG also reinforced the scheme with her own communications to Victim B. For example, on February 26, 2024, JUG urged Victim B to liquidate his retirement account,

telling him, "You mine as well take that money out of your 401k and seriously just put it back when you get your money back." A few days later, on February 29, 2024, JUG sent Victim B a picture of a computer screen showing her attempting to open a new bank account for him. Accompanying the photo, JUG wrote, "Either way, if you don't help with the house, or you do, you need another bank account because Landmark was asking you questions before. So I don't want anything happening and so I was going to open a new bank account online for you."

### *Victim C*

36. Victim C is an elderly individual with chronic leukemia. His wife suffers from severe dementia, and their shared daughter retains temporary guardianship over her. Several years before meeting JUG, Victim C moved out of his marital residence (where his wife continues to reside) and began renting a duplex unit down the street.

37. In October 2023, Victim C met JUG at Heartbreakers Strip Club, and JUG introduced him to SHIELDS. Soon afterward, according to Victim C's children, Victim C began withdrawing unusually large amounts of cash, opening credit cards (through online applications) for JUG and SHIELDS, and paying off substantial balances that they ran up.

38. In late 2023, according to Victim C and his children, JUG told Victim C she needed help purchasing a residence at 2148 S. 91st Street in West Allis, Wisconsin. JUG falsely claimed that GARDNER owned the home and would be selling it to her. Handwritten notes, which Victim C's daughter found at Victim C's residence, document that Victim C paid $154,000 from his Chase Bank account for 2148 S. 91st Street. Bank records show that Victim C provided GARDNER with a $154,000 check for the supposed purchase. Additional bank records, discussed below, show that GARDNER also received additional wire transfers and deposits from Victim C.

39. Real-estate records reviewed by investigators confirm that 2148 S. 91st Street was owned by Big Fish Investments LLC. The owner of Big Fish Investments LLC confirmed that SHIELDS, JUG, and GARDNER never owned the property. He said JUG had been a tenant at the time she told Victim C that she was purchasing the property. He did not even know SHIELDS or GARDNER.

40. JUG and SHIELDS also provided false "collateral" to Victim C in the form of two fictitious checks from "JD Investment" totaling approximately $530,000. They told Victim C that the checks represented land-sale proceeds that they were owed, but that they could not access due to IRS liens on their accounts.

41. On June 12, 2025, West Allis Police Department detectives interviewed SHIELDS at 1442 Big Bend Road, Unit D, Waukesha, WI 53189. SHIELDS told detectives that she and JUG met Victim C at Heartbreakers Strip Club in West Allis and later began cleaning his residence. SHIELDS said that Victim C frequently asked her to cash checks for him because his family was no longer giving him money, falsely explaining that JUG was helping care for Victim C's wife, who suffered from dementia. SHIELDS denied involvement in any scheme to purchase a residence at 2148 S. 91st Street. She asserted she never received money from JUG, never used Victim C's credit cards, and denied ever providing Victim C with collateral checks. She also denied ever being jailed for IRS issues—contrary to what Victim C, and the other victims, had been led to believe.

42. On January 22, 2026, West Allis Police Department detectives spoke with GARDNER at her residence located at 201 Estberg Avenue, Waukesha, Wisconsin 53186. GARDNER initially denied cashing checks for Victim C. She stated she had never been to Victim C's home and claimed that although SHIELDS once gave her a check to deposit, she did not remember the payee, amount, or whether she kept any portion of the money. GARDNER described herself as vague on financial

details, stating her Chase Bank account was later closed for reasons unknown to her. GARDNER said she believed Victim C was “a nice guy” who freely gave money to JUG and other women; she denied ever discussing property purchases, tax issues, or receiving wire transfers from JUG.

43. Bank records reviewed by investigators show that Victim C provided approximately $539,973.00 to JUG, GARDNER, JUAREZ, and SHIELDS between September 5, 2023, and December 18, 2024.

***Victim D***

44. Victim D told investigators that he has given more than $2,000,000 to JUAREZ and SHIELDS. Victim D, who had diligently saved for his retirement by working for decades in construction, explained that he believed he was loaning SHIELDS money, through her purported attorney, JUAREZ, so that SHIELDS could pay off her supposed IRS tax debt.

45. Victim D met SHIELDS in late 2024 at a Waukesha bowling alley, and the two began dating. In early 2025, SHIELDS told Victim D she was receiving IRS levy notices stemming from supposed business tax liabilities incurred by her ex-husband. Based on those claims, and fraudulent IRS documents that SHIELDS repeatedly presented to him, Victim D wrote large checks on SHIELDS’s behalf, intended for the IRS, but directed to her supposed attorney, JUAREZ, at SHIELDS’s request. Victim D told investigators that he believed the tax debt was legitimate, particularly because SHIELDS’s mother, GARDNER, reinforced the deception, assuring him that the tax liabilities were real. GARDNER also told Victim D that JUAREZ was a licensed attorney whose office was next to a building she cleaned in Brookfield, Wisconsin. Investigators confirmed through the Wisconsin Bar registry and employment records that JUAREZ is not a licensed attorney.

46. Throughout 2025, SHIELDS told Victim D that she had attended (nonexistent) “IRS hearings,” which allegedly resulted in her supposed tax liabilities suddenly increasing, prompting her to continue to solicit Victim D for more money. Victim D diligently tracked all funds he provided to SHIELDS, and he had SHIELDS sign numerous promissory notes acknowledging receipt of the money. The final promissory note, signed August 13, 2025, reflects that SHIELDS had received $1,467,852 from Victim D.

47. To maintain the fraud scheme, SHIELDS showed Victim D fraudulent checks that she represented as “collateral.” These included two fake Farmers Insurance checks for supposed “death benefits” totaling over $2,500,000. SHIELDS also presented Victim D with a fictitious $3,000,000 “trust fund” gift check from “Frank and Mary Mueller,” claiming that the gift check could not be deposited until after August 1, 2026, and that the funds would become accessible once IRS levies were resolved.

48. After August 1, 2026, Victim D asked SHIELDS about the status of the $3,000,000 gift-check deposit. SHIELDS told Victim D that Chase Bank would not deposit the check because of supposed IRS issues. Chase Bank records obtained and reviewed by investigators confirm that SHIELDS had no accounts there. Additionally, investigators confirmed that the listed address for “Frank and Mary Mueller” in Brookfield, Wisconsin does not exist and that no individuals with those names are known to reside together in Brookfield.

49. Believing SHIELDS’s false representations, Victim D continued to make repeated large withdrawals from his retirement and brokerage accounts by ACH transfers, incurring substantial tax liabilities.

50. Bank records reviewed by investigators to date confirm that Victim D provided approximately $2,300,000 to JUAREZ.

***Consensually Monitored Phone Call***

51. During law enforcement's interview with Victim D on August 26, 2026, Victim D agreed to place an electronically monitored phone call to SHIELDS at 262-765-6482. Investigators recorded and observed the call in real time.

52. During the call, Victim D told SHIELDS that police were asking questions about JUAREZ because of the checks Victim D had sent him. SHIELDS immediately responded, "yeah but the money was for me and my IRS debt, it wasn't for him." Victim D then told SHIELDS that police informed him JUAREZ was not an attorney, and SHIELDS falsely replied, "yes, he has an attorney license, and yes, he does all financial shit." When Victim D asked SHIELDS how she got into contact with JUAREZ, SHIELDS responded, "I cleaned for one of his friends for years, he's like a financial attorney."

53. Victim D also asked SHIELDS if there was any news about the previously rejected $3,000,000 trust-fund check. SHIELDS responded, "No, they said that IRS has everything frozen because of me paying that amount of money for federal taxes and that I am under investigation for borrowing that much money."

54. SHIELDS asked Victim D why law enforcement was interested in JUAREZ and falsely indicated that JUAREZ had used Victim D's money to pay her "tax debt," as Victim D intended, saying, "He didn't defraud me; I have the receipts and everything got paid. Or is he under investigation and they're just asking everyone who wrote checks through him?" She continued, "well he made all of my payments ["tax" payments] and didn't steal the money, so why is that a crime? Maybe he got in trouble for something else, so I am not going to talk to him anymore."

55. Bank records show that JUAREZ spent Victim D's funds primarily at casinos and via cash withdrawals; he did not pay any tax liabilities.

### *JUG Bank Records*

56. Bank records show that JUG opened multiple accounts between 2023 and 2026 that received large deposits from Victim A, Victim B, and Victim C. These deposits were immediately followed by cash withdrawals, transfers to peer-to-peer payment platforms, and personal spending inconsistent with any legitimate business or IRS-related payments.

57. Educators Credit Union account x0991, opened June 29, 2023, for which JUG was the sole signatory, received approximately $193,100 in deposits from Victim B and Victim C between September 5, 2023, and August 22, 2024. Investigators observed that these deposits were quickly depleted through large cash withdrawals, CashApp transfers to her own CashApp account and to JUAREZ, and purchases at hotels, rental-car companies, and luxury retailers. No IRS payments or legitimate investment activity appeared in the account. The financial institution later closed the account.

58. On October 6, 2024, JUG opened UW Credit Union account x8701, for which she was the sole signatory. The account later received approximately $182,073 from Victim A and Victim C, including the $63,073.03 BMO Bank cashier's check Victim A provided after JUG falsely claimed she owed IRS debt. JUG immediately conducted three structured withdrawals ($6,000; $7,000; $5,000) and directed the remaining funds to CashApp and Apple Cash. A separate $40,000 "business loan" check from Victim C was similarly followed by a $7,000 cash withdrawal and transfers to JUG's own CashApp, with no business-related expenditures documented.

59. On November 5, 2025, Victim A opened UWCU account x8201, and JUG was added as a joint signer shortly thereafter. The day after she was added, Victim A deposited $80,000 intended to cover JUG's expenses while she awaited a fictitious "Aurora Hospital" settlement. Between December 22, 2025, and February 24, 2026, JUG transferred $24,310 from the shared account

(x8201) into her personal UWCU account (x8701), then used the funds for Apple Cash and CashApp payments. Additionally, the shared account showed $27,302 in cash withdrawals and purchases at Lululemon, Alo Yoga, Sephora, Dick's Sporting Goods, Harry Glinberg Jewelers, and hotel stays at Holiday Inn and Sybaris Pool Suites—all occurring after the $80,000 deposit by Victim A.

60. On April 4, 2026, after being told that JUG and SHIELDS needed $220,000 to purchase a transportation business from JUAREZ, Victim A deposited $220,000 into the shared UWCU account (x8201). Two days later, JUG transferred $210,000 into her personal UWCU account (x8701) and then wired $110,000 to JUAREZ's personal Wells Fargo checking account x4270. After the transfer, UWCU requested Wells Fargo return the funds due to suspected fraud. On May 21, 2026, UWCU received $108,500 back from Wells Fargo and issued it via cashier's check to Victim A, who then immediately deposited it into a new US Bank account. On June 2, 2026, Victim A withdrew $109,000 from that US Bank account, in the form of two cashier's checks—one payable to DAVID JUAREZ for $55,000 (memo: land rent) and the other payable to SAVANNAH JUG for $54,000 (memo: property). As noted above, these transactions align with text messages sent from SHIELDS to Victim A, instructing him about what (false) language to include in the check memo lines, to avoid bank scrutiny.

61. Navy Federal Credit Union records show that JUG opened account x9946, for which she was the sole signatory, on October 8, 2024. On May 4, 2026, this account received a $69,500 check from Victim A with the memo "farmland." Victim A told investigators that JUG added this false memo line to avoid bank scrutiny, and Victim A told investigators the funds were intended for SHIELDS's purported tax liabilities or business investments. Navy Federal ultimately froze the account due to suspected fraud.

62. Across all accounts, JUG repeatedly received victim funds and immediately liquidated the proceeds through cash withdrawals, peer-to-peer transfers, luxury purchases, and transfers to JUAREZ. Investigators identified no IRS payments, business expenses, or legitimate investments in any of JUG's accounts.

***GARDNER Bank Records***

63. Bank records show that GARDNER used her Chase Bank checking account x5562 and savings account x8781, opened on December 16, 2020, to receive large sums of victim funds. GARDNER immediately wired those proceeds to accounts belonging to JUG and JUAREZ, where the money was rapidly dissipated through cash withdrawals, CashApp transfers, and casino gambling.

64. On October 11, 2023, GARDNER's checking account received a $32,100 check from Victim B. Six days later, on October 17, 2023, a $140,000 wire transfer from Victim C was deposited into the same account. Within hours, GARDNER withdrew $5,000 in cash and wired $25,000 to JUG's Educators Credit Union account x0991, labeling the transfer "down payment for condo." After receiving the funds, JUG withdrew $20,000 from her Educators Credit Union account and transferred the remaining balance to her CashApp account.

65. The next day, October 18, 2023, GARDNER wired $102,900 to JUAREZ's Chase Bank account x8015. Immediately after receiving the funds, JUAREZ sent $10,000 to Jordan Shields ("happy birthday") and spent the remaining balance on CashApp transfers and gambling activity at Potawatomi, Ho-Chunk, and other casinos.

66. On November 8, 2023, GARDNER deposited a $154,000 check from Victim C into Chase account x5562. Victim C told investigators this deposit was purportedly for GARDNER to purchase a residence for JUG. However, that residence was never owned by GARDNER. Within

two days, GARDNER wired $81,000 to JUG's Educators Credit Union account x0991 and wired the remaining $73,000 to JUAREZ's Chase account x8015. Review of subsequent debits in JUAREZ's and JUG's accounts shows approximately $96,000 sent via CashApp, $50,000 spent at casinos, and $10,000 withdrawn as cash. None of the funds were used for the home purchase that Victim C believed he was financing.

***JUAREZ Bank Records***

67. Bank records show that JUAREZ opened and controlled multiple financial accounts used to receive and launder large volumes of fraud proceeds provided by Victim A, Victim B, Victim C, and Victim D between 2023 and 2026.

68. On July 10, 2023, JUAREZ opened a Chase Bank checking account (x8015), for which he was the sole signatory. This account received $111,000 in deposits from Victim B and Victim C, including two $43,000 wires from Victim B that directly matched text messages in which SHIELDS solicited those exact amounts. Contrary to Victim B's belief that JUAREZ was acting as SHIELDS's attorney and would pay her IRS debt, no IRS payments were found in the account. Instead, JUAREZ wired large portions of the funds to JUG, made substantial CashApp transfers to himself, and spent thousands of dollars at casinos within days of receiving victim funds.

69. On November 21, 2023, JUAREZ opened Wells Fargo account x4270, for which he was the sole signatory. JUAREZ listed his occupation as "Buyer" for "RB Wagner." Between May 16, 2024, and February 27, 2026, this account received approximately $1,923,421 in deposits, with $1,800,421 coming directly from Victim D. These funds were accompanied by memo lines such as "loan to JENNIFER," "loan," and "van purchase." Nearly all of the money was quickly spent. Bank records show that JUAREZ spent approximately $1,121,976 at casinos across Wisconsin and Illinois between March 20, 2025, and March 6, 2026. Additionally, JUAREZ transferred

hundreds of thousands of dollars to SHIELDS through CashApp, and used victim proceeds for personal expenses including cruise-line charges, mortgage-related payments, and a $15,000 payment to purchase his Chevy Trax SUV.

70. On March 20, 2024, JUAREZ opened Educators Credit Union account x1090, for which he was the sole signatory, listing his job as "Buyer" at "RB Wagner" rather than any legal profession. Between March 20, 2025, and April 24, 2026, this account received $471,265 in victim proceeds, primarily comprised of a $452,265 check from Victim D intended for SHIELDS's purported IRS debt. With these funds, JUAREZ immediately spent approximately $140,000 at casinos, $80,000 through Apple Cash transfers, and $25,000 on credit-card payments. Additional victim-funded debits included $20,000 sent to SHIELDS's son, Austin, and multiple wire transfers, some of which were over $10,000, to a mortgage company totaling over $40,000. Investigators believe these mortgages payments were related to the purchase of JUAREZ's current residence. Investigators identified no legitimate business expenditures or IRS payments.

71. On April 2, 2026, JUAREZ opened Navy Federal account x7054, for which he was the sole signatory. The only deposit into this account was $40,000 from Victim A, with a memo line "trailer/gravel." Victim A later confirmed that this memo had been added by JUG to avoid bank scrutiny. Navy Federal froze the account shortly thereafter due to suspected fraud.

72. Overall, JUAREZ's accounts collectively received well over $2.5 million in victim funds and showed a consistent pattern of rapid transfers to JUG and SHIELDS, large-scale casino gambling, peer-to-peer payments to himself, and personal expenditures, with no evidence of IRS payments or any legitimate business activity.

73. Investigators reviewed IRS tax records for JUG and SHIELDS. Although approximately $664,673.03 in fraud proceeds were deposited into JUG's bank accounts between September 5,

2023, and May 4, 2026, JUG reported only $60,661 in total income on her Form 1040, Individual Income Tax Return, for tax years 2023, 2024, and 2025. On JUG's 2024 Form 1040, she claimed a $14,000 profit as an "entertainer" at Heartbreakers, and on JUG's 2025 return she claimed an $18,000 profit as an "independent artist" at the same establishment. JUG's listed phone number on her 2025 Form 1040 is 414-828-4291, the same telephone number she used to communicate with Victim B.

74. IRS records show that SHIELDS did not file Form 1040, Individual Income Tax Returns, for tax years 2023, 2024, or 2025. As noted above, IRS records also show no liens, levies, or active collection actions against the assets or bank accounts of SHIELDS. Based on victim interviews, corroborating text messages, and the absence of bank accounts in SHIELDS's name, investigators believe she has been using JUAREZ's bank accounts to facilitate her illegal activities and to evade the assessment of tax. Between September 21, 2023, and May 6, 2026, deposits totaling approximately $2,555,686.00 in fraudulent proceeds were made into JUAREZ's accounts directly from victims, despite no victim reporting direct communication with JUAREZ.

75. On January 20, 2026, JUG filed a Form SS-4 with the IRS to obtain an Employer Identification Number (EIN) for a business listed as "Efficient Transport Associates," with an address of 7638 S. Wingspan Way, Oak Creek, Wisconsin. JUG is the sole member identified on the SS-4, and the business's principal service is listed as "trucking." On July 14, 2026, the Wisconsin Department of Financial Institutions (DFI) confirmed that it found no articles of incorporation or organization for Efficient Transport Associates, and records from the Wisconsin Department of Workforce Development reflect no reportable wages for the entity. Based on my training and experience, I believe Efficient Transport Associates is a shell company created to use

the EIN and SS-4 paperwork to open additional bank accounts and continue receiving proceeds of fraud.

***Conclusion***

76. Based on the foregoing, there is probable cause to believe that in the Eastern District of Wisconsin and elsewhere, beginning at least by approximately November 2022, through the present, DAVID JUAREZ, JENNIFER SHIELDS, SAVANNAH JUG, and JULIE GARDNER, committed, or aided and abetted, violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions).